(Slip Opinion)	OCTOBER TERM, 2010	1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CONNICK, DISTRICT ATTORNEY, ET AL. *v.* THOMPSON

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 09–571.   Argued October 6, 2010—Decided March 29, 2011

Petitioner the Orleans Parish District Attorney's Office concedes that,
in prosecuting respondent Thompson for attempted armed robbery,
prosecutors violated *Brady* v. *Maryland*, 373 U. S. 83, by failing to
disclose a crime lab report.   Because of his robbery conviction,
Thompson elected not to testify at his later murder trial and was
convicted.   A month before his scheduled execution, the lab report
was discovered.   A reviewing court vacated both convictions, and
Thompson was found not guilty in a retrial on the murder charge.   He
then filed suit against the district attorney's office under 42 U. S. C.
§1983, alleging*, inter alia*, that the *Brady* violation was caused by the
office's deliberate indifference to an obvious need to train prosecutors
to avoid such constitutional violations.   The district court held that,
to prove deliberate indifference, Thompson did not need to show a
pattern of similar *Brady* violations when he could demonstrate that
the need for training was obvious.   The jury found the district attor-
ney's office liable for failure to train and awarded Thompson dam-
ages.   The Fifth Circuit affirmed by an equally divided court.

*Held:* A district attorney's office may not be held liable under §1983 for
failure to train its prosecutors based on a single *Brady* violation.   Pp.
6–20.

    (a) Plaintiffs seeking to impose §1983 liability on local governments
must prove that their injury was caused by "action pursuant to offi-
cial municipal policy," which includes the decisions of a government's
lawmakers, the acts of its policymaking officials, and practices so
persistent and widespread as to practically have the force of law.
*Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 691.   A
local government's decision not to train certain employees about their

legal duty to avoid violating citizens' rights may rise to the level of an official government policy for §1983 purposes, but the failure to train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton* v. *Harris*, 489 U. S. 378, 388. Deliberate indifference in this context requires proof that city policymakers disregarded the "known or obvious consequence" that a particular omission in their training program would cause city employees to violate citizens' constitutional rights. *Board of Comm'rs of Bryan Cty.* v. *Brown*, 520 U. S. 397, 410. Pp. 6–9.

(b) A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference. *Bryan Cty., supra*, at 409. Without notice that a course of training is deficient, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. Thompson does not contend that he proved a pattern of similar *Brady* violations, and four reversals by Louisiana courts for dissimilar *Brady* violations in the 10 years before the robbery trial could not have put the district attorney's office on notice of the need for specific training. Pp. 9–10.

(c) Thompson mistakenly relies on the "single-incident" liability hypothesized in *Canton*, contending that the *Brady* violation in his case was the "obvious" consequence of failing to provide specific *Brady* training and that this "obviousness" showing can substitute for the pattern of violations ordinarily necessary to establish municipal culpability. In *Canton*, the Court theorized that if a city armed its police force and deployed them into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force, the failure to train could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights. Failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability. The obvious need for specific legal training present in *Canton*'s scenario—police academy applicants are unlikely to be familiar with constitutional constraints on deadly force and, absent training, cannot obtain that knowledge—is absent here. Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. They receive training before entering the profession, must usually satisfy continuing education requirements, often train on the job with more experienced attorneys, and must satisfy licensing standards and ongoing ethical obligations. Prosecutors not only are equipped but are ethically bound to know what *Brady* entails and to perform legal research

when they are uncertain. Thus, recurring constitutional violations are not the "obvious consequence" of failing to provide prosecutors with formal in-house training. The nuance of the allegedly necessary training also distinguishes the case from the example in *Canton*. Here, the prosecutors were familiar with the general *Brady* rule. Thus, Thompson cannot rely on the lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical, but must assert that prosecutors were not trained about particular *Brady* evidence or the specific scenario related to the violation in his case. That sort of nuance simply cannot support an inference of deliberate indifference here. Contrary to the holding below, it does not follow that, because *Brady* has gray areas and some *Brady* decisions are difficult, prosecutors will so obviously make wrong decisions that failing to train them amounts, as it must, to "a decision by the city itself to violate the Constitution." *Canton,* 489 U. S., at 395 (O'Connor, J., concurring in part and dissenting in part). Pp. 11–19.

578 F. 3d 293, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion, in which ALITO, J., joined. GINSBURG, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–571

HARRY F. CONNICK, DISTRICT ATTORNEY, ET AL., PETITIONERS *v.* JOHN THOMPSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 29, 2011]

JUSTICE THOMAS delivered the opinion of the Court.

The Orleans Parish District Attorney's Office now concedes that, in prosecuting respondent John Thompson for attempted armed robbery, prosecutors failed to disclose evidence that should have been turned over to the defense under *Brady* v. *Maryland*, 373 U. S. 83 (1963). Thompson was convicted. Because of that conviction Thompson elected not to testify in his own defense in his later trial for murder, and he was again convicted. Thompson spent 18 years in prison, including 14 years on death row. One month before Thompson's scheduled execution, his investigator discovered the undisclosed evidence from his armed robbery trial. The reviewing court determined that the evidence was exculpatory, and both of Thompson's convictions were vacated.

After his release from prison, Thompson sued petitioner Harry Connick, in his official capacity as the Orleans Parish District Attorney, for damages under Rev. Stat. §1979, 42 U. S. C. §1983. Thompson alleged that Connick had failed to train his prosecutors adequately about their duty to produce exculpatory evidence and that the lack of

training had caused the nondisclosure in Thompson's robbery case. The jury awarded Thompson $14 million, and the Court of Appeals for the Fifth Circuit affirmed by an evenly divided en banc court. We granted certiorari to decide whether a district attorney's office may be held liable under §1983 for failure to train based on a single *Brady* violation. We hold that it cannot.

## I

### A

In early 1985, John Thompson was charged with the murder of Raymond T. Liuzza, Jr. in New Orleans. Publicity following the murder charge led the victims of an unrelated armed robbery to identify Thompson as their attacker. The district attorney charged Thompson with attempted armed robbery.

As part of the robbery investigation, a crime scene technician took from one of the victims' pants a swatch of fabric stained with the robber's blood. Approximately one week before Thompson's armed robbery trial, the swatch was sent to the crime laboratory. Two days before the trial, assistant district attorney Bruce Whittaker received the crime lab's report, which stated that the perpetrator had blood type B. There is no evidence that the prosecutors ever had Thompson's blood tested or that they knew what his blood type was. Whittaker claimed he placed the report on assistant district attorney James Williams' desk, but Williams denied seeing it. The report was never disclosed to Thompson's counsel.

Williams tried the armed robbery case with assistant district attorney Gerry Deegan. On the first day of trial, Deegan checked all of the physical evidence in the case out of the police property room, including the blood-stained swatch. Deegan then checked all of the evidence but the swatch into the courthouse property room. The prosecutors did not mention the swatch or the crime lab report at

trial, and the jury convicted Thompson of attempted armed robbery.

A few weeks later, Williams and special prosecutor Eric Dubelier tried Thompson for the Liuzza murder. Because of the armed robbery conviction, Thompson chose not to testify in his own defense. He was convicted and sentenced to death. *State* v. *Thompson*, 516 So. 2d 349 (La. 1987). In the 14 years following Thompson's murder conviction, state and federal courts reviewed and denied his challenges to the conviction and sentence. See *State ex rel. Thompson* v. *Cain*, 95–2463 (La. 4/25/96), 672 So. 2d 906; *Thompson* v. *Cain*, 161 F. 3d 802 (CA5 1998). The State scheduled Thompson's execution for May 20, 1999.

In late April 1999, Thompson's private investigator discovered the crime lab report from the armed robbery investigation in the files of the New Orleans Police Crime Laboratory. Thompson was tested and found to have blood type O, proving that the blood on the swatch was not his. Thompson's attorneys presented this evidence to the district attorney's office, which, in turn, moved to stay the execution and vacate Thompson's armed robbery conviction.[1] The Louisiana Court of Appeals then reversed Thompson's murder conviction, concluding that the armed robbery conviction unconstitutionally deprived Thompson of his right to testify in his own defense at the murder trial. *State* v. *Thompson*, 2002–0361 (La. App. 7/17/02), 825 So. 2d 552. In 2003, the district attorney's office

─────────

[1] After Thompson discovered the crime lab report, former assistant district attorney Michael Riehlmann revealed that Deegan had confessed to him in 1994 that he had "intentionally suppressed blood evidence in the armed robbery trial of John Thompson that in some way exculpated the defendant." Record EX583; see also *id.*, at 2677. Deegan apparently had been recently diagnosed with terminal cancer when he made his confession. Following a disciplinary complaint by the district attorney's office, the Supreme Court of Louisiana reprimanded Riehlmann for failing to disclose Deegan's admission earlier. *In re Riehlmann*, 2004–0680 (La. 1/19/05), 891 So. 2d 1239.

retried Thompson for Liuzza's murder.[2]   The jury found
him not guilty.

## B

Thompson then brought this action against the district
attorney's office, Connick, Williams, and others, alleging
that their conduct caused him to be wrongfully convicted,
incarcerated for 18 years, and nearly executed.  The only
claim that proceeded to trial was Thompson's claim under
§1983 that the district attorney's office had violated *Brady*
by failing to disclose the crime lab report in his armed
robbery trial.  See *Brady*, 373 U. S. 83.  Thompson alleged
liability under two theories: (1) the *Brady* violation was
caused by an unconstitutional policy of the district attor-
ney's office; and (2) the violation was caused by Connick's
deliberate indifference to an obvious need to train the
prosecutors in his office in order to avoid such constitu-
tional violations.

Before trial, Connick conceded that the failure to pro-
duce the crime lab report constituted a *Brady* violation.[3]
See Record EX608, EX880.  Accordingly, the District Court
instructed the jury that the "only issue" was whether the
nondisclosure was caused by either a policy, practice, or
custom of the district attorney's office or a deliberately
indifferent failure to train the office's prosecutors.  Record
1615.

Although no prosecutor remembered any specific train-
ing session regarding *Brady* prior to 1985, it was undis-
puted at trial that the prosecutors were familiar with the

_____

[2] Thompson testified in his own defense at the second trial and pre-
sented evidence suggesting that another man committed the murder.
That man, the government's key witness at the first murder trial, had
died in the interval between the first and second trials.

[3] Because Connick conceded that the failure to disclose the crime lab
report violated *Brady*, that question is not presented here, and we do
not address it.

general *Brady* requirement that the State disclose to the
defense evidence in its possession that is favorable to
the accused. Prosecutors testified that office policy was to
turn crime lab reports and other scientific evidence over
to the defense. They also testified that, after the discovery
of the undisclosed crime lab report in 1999, prosecutors
disagreed about whether it had to be disclosed under
*Brady* absent knowledge of Thompson's blood type.

The jury rejected Thompson's claim that an unconstitu-
tional office policy caused the *Brady* violation, but found
the district attorney's office liable for failing to train the
prosecutors. The jury awarded Thompson $14 million in
damages, and the District Court added more than $1
million in attorney's fees and costs.

After the verdict, Connick renewed his objection—which
he had raised on summary judgment—that he could not
have been deliberately indifferent to an obvious need for
more or different *Brady* training because there was no
evidence that he was aware of a pattern of similar *Brady*
violations. The District Court rejected this argument for
the reasons that it had given in the summary judgment
order. In that order, the court had concluded that a pat-
tern of violations is not necessary to prove deliberate
indifference when the need for training is "so obvious."
No. Civ. A. 03–2045 (ED La., Nov. 15, 2005), App. to Pet.
for Cert. 141a, 2005 WL 3541035, *13. Relying on *Canton*
v. *Harris*, 489 U. S. 378 (1989), the court had held that
Thompson could demonstrate deliberate indifference by
proving that "the DA's office knew to a moral certainty
that assistan[t] [district attorneys] would acquire *Brady*
material, that without training it is not always obvious
what *Brady* requires, and that withholding *Brady* mate-
rial will virtually always lead to a substantial violation of
constitutional rights."[4] App. to Pet. for Cert. 141a, 2005

_____

[4] The District Court rejected Connick's proposed deliberate indiffer-

WL 3541035, *13.

A panel of the Court of Appeals for the Fifth Circuit affirmed. The panel acknowledged that Thompson did not present evidence of a pattern of similar *Brady* violations, 553 F. 3d 836, 851 (2008), but held that Thompson did not need to prove a pattern, *id.*, at 854. According to the panel, Thompson demonstrated that Connick was on notice of an obvious need for *Brady* training by presenting evidence "that attorneys, often fresh out of law school, would undoubtedly be required to confront *Brady* issues while at the DA's Office, that erroneous decisions regarding *Brady* evidence would result in serious constitutional violations, that resolution of *Brady* issues was often unclear, and that training in *Brady* would have been helpful." 553 F. 3d, at 854.

The Court of Appeals sitting en banc vacated the panel opinion, granted rehearing, and divided evenly, thereby affirming the District Court. 578 F. 3d 293 (CA5 2009) *(per curiam)*. In four opinions, the divided en banc court disputed whether Thompson could establish municipal liability for failure to train the prosecutors based on the single *Brady* violation without proving a prior pattern of similar violations, and, if so, what evidence would make that showing. We granted certiorari. 559 U. S. ___ (2010).

II

The *Brady* violation conceded in this case occurred when one or more of the four prosecutors involved with Thompson's armed robbery prosecution failed to disclose the crime lab report to Thompson's counsel. Under Thompson's failure-to-train theory, he bore the burden of proving both (1) that Connick, the policymaker for the district attorney's office, was deliberately indifferent to the need to

───────────

ence jury instruction—which would have required Thompson to prove a pattern of similar violations—for the same reasons as the summary judgment motion. Tr. 1013; Record 993; see also Tr. of Oral Arg. 26.

train the prosecutors about their *Brady* disclosure obliga-
tion with respect to evidence of this type and (2) that the
lack of training actually caused the *Brady* violation in this
case. Connick argues that he was entitled to judgment as
a matter of law because Thompson did not prove that he
was on actual or constructive notice of, and therefore
deliberately indifferent to, a need for more or different
*Brady* training. We agree.[5]

## A

Title 42 U. S. C. §1983 provides in relevant part:

> "Every person who, under color of any statute, ordi-
> nance, regulation, custom, or usage, of any State . . .
> subjects, or causes to be subjected, any citizen of the

---

[5] Because we conclude that Thompson failed to prove deliberate indif-
ference, we need not reach causation. Thus, we do not address whether
the alleged training deficiency, or some other cause, was the "'moving
force,'" *Canton* v. *Harris*, 489 U. S. 378, 389 (1989) (quoting *Monell* v.
*New York City Dept. of Social Servs.*, 436 U. S. 658, 694 (1978), and
*Polk County* v. *Dodson*, 454 U. S. 312, 326 (1981)), that "actually
caused" the failure to disclose the crime lab report, *Canton*, *supra*, at
391.

The same cannot be said for the dissent, however. Affirming the
verdict in favor of Thompson would require finding both that he proved
deliberate indifference and that he proved causation. Perhaps unsur-
prisingly, the dissent has not conducted the second step of the analysis,
which would require showing that the failure to provide particular
training (which the dissent never clearly identifies) "actually caused"
the flagrant—and quite possibly intentional—misconduct that occurred
in this case. See *post*, at 21 (opinion of GINSBURG, J.) (assuming that,
"[h]ad *Brady*'s importance been brought home to prosecutors," the
violation at issue "surely" would not have occurred). The dissent
believes that evidence that the prosecutors allegedly "misappre-
hen[ded]" *Brady* proves causation. *Post*, at 27, n. 20. Of course, if
evidence of a need for training, by itself, were sufficient to prove that
the lack of training "actually caused" the violation at issue, no causa-
tion requirement would be necessary because every plaintiff who
satisfied the deliberate indifference requirement would necessarily
satisfy the causation requirement.

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 692 (1978). But, under §1983, local governments are responsible only for "their *own* illegal acts." *Pembaur* v. *Cincinnati*, 475 U. S. 469, 479 (1986) (citing *Monell*, 436 U. S., at 665–683). They are not vicariously liable under §1983 for their employees' actions. See *id.*, at 691; *Canton*, 489 U. S., at 392; *Board of Comm'rs of Bryan Cty.* v. *Brown*, 520 U. S. 397, 403 (1997) (collecting cases).

Plaintiffs who seek to impose liability on local governments under §1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U. S., at 691; see *id.*, at 694. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. See *ibid.*; *Pembaur, supra*, at 480–481; *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 167–168 (1970). These are "action[s] for which the municipality is actually responsible." *Pembaur, supra*, at 479–480.

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.

See *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U. S., at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under §1983." *Id.*, at 389.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U. S., at 410. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U. S., at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.*, at 392; see also *Pembaur, supra*, at 483 (opinion of Brennan, J.) ("[M]unicipal liability under §1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . .").

### B

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate

deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U. S., at 409. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*, at 407. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Although Thompson does not contend that he proved a pattern of similar *Brady* violations, 553 F. 3d, at 851, vacated, 578 F. 3d 293 (en banc), he points out that, during the ten years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of *Brady* violations by prosecutors in Connick's office.[6] Those four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here. None of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind. Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.[7]

---------------

[6] Thompson had every incentive at trial to attempt to establish a pattern of similar violations, given that the jury instruction allowed the jury to find deliberate indifference based on, among other things, prosecutors' "history of mishandling" similar situations. Record 1619.

[7] Thompson also asserts that this case is not about a "single incident" because up to four prosecutors may have been responsible for the nondisclosure of the crime lab report and, according to his allegations, withheld additional evidence in his armed robbery and murder trials. But contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide "notice to the cit[y] and the opportunity to conform to constitutional dictates . . . ." *Canton*, 489 U. S., at 395

## C

### 1

Instead of relying on a pattern of similar *Brady* violations, Thompson relies on the "single-incident" liability that this Court hypothesized in *Canton*. He contends that the *Brady* violation in his case was the "obvious" consequence of failing to provide specific *Brady* training, and that this showing of "obviousness" can substitute for the pattern of violations ordinarily necessary to establish municipal culpability.

In *Canton*, the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. *Bryan Cty.*, *supra*, at 409. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Canton*, *supra*, at 390, n. 10. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty.*, *supra*, at 409. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under §1983 without proof of a pre-existing pattern of violations.

––––––––––

(O'Connor, J., concurring in part and dissenting in part). Moreover, no court has ever found any of the other *Brady* violations that Thompson alleges occurred in his armed robbery and murder trials.

Failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability. The obvious need for specific legal training that was present in the *Canton* scenario is absent here. Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training. In stark contrast, legal "[t]raining is what differentiates attorneys from average public employees." 578 F. 3d, at 304–305 (opinion of Clement, J.).

Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. Before they may enter the profession and receive a law license, all attorneys must graduate from law school or pass a substantive examination; attorneys in the vast majority of jurisdictions must do both. See, *e.g.*, La. State Bar Assn. (LSBA), Articles of Incorporation, La. Rev. Stat. Ann. §37, ch. 4, App., Art. 14, §7 (1988 West Supp.) (as amended through 1985). These threshold requirements are designed to ensure that all new attorneys have learned how to find, understand, and apply legal rules. Cf. *United States* v. *Cronic*, 466 U. S. 648, 658, 664 (1984) (noting that the presumption "that the lawyer is competent to provide the guiding hand that the defendant needs" applies even to young and inexperienced lawyers in their first jury trial and even when the case is complex).

Nor does professional training end at graduation. Most jurisdictions require attorneys to satisfy continuing-education requirements. See, *e.g.*, LSBA, Articles of Incorporation, Art. 16, Rule 1.1(b) (effective 1987); La. Sup.

Ct. Rule XXX (effective 1988). Even those few jurisdictions that do not impose mandatory continuing-education requirements mandate that attorneys represent their clients competently and encourage attorneys to engage in continuing study and education. See, *e.g.*, Mass. Rule Prof. Conduct 1.1 and comment 6 (West 2006). Before Louisiana adopted continuing-education requirements, it imposed similar general competency requirements on its state bar. LSBA, Articles of Incorporation, Art. 16, EC 1–1, 1–2, DR 6–101 (West 1974) (effective 1971).

Attorneys who practice with other attorneys, such as in district attorney's offices, also train on the job as they learn from more experienced attorneys. For instance, here in the Orleans Parish District Attorney's Office, junior prosecutors were trained by senior prosecutors who supervised them as they worked together to prepare cases for trial, and trial chiefs oversaw the preparation of the cases. Senior attorneys also circulated court decisions and instructional memoranda to keep the prosecutors abreast of relevant legal developments.

In addition, attorneys in all jurisdictions must satisfy character and fitness standards to receive a law license and are personally subject to an ethical regime designed to reinforce the profession's standards. See, *e.g.,* LSBA, Articles of Incorporation, Art. 14, §7 (1985); see generally *id.*, Art. 16 (1971) (Code of Professional Responsibility). Trial lawyers have a "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland* v. *Washington*, 466 U. S. 668, 688 (1984). Prosecutors have a special "duty to seek justice, not merely to convict." LSBA, Articles of Incorporation, Art. 16, EC 7–13 (1971); ABA Standards for Criminal Justice 3–1.1(c) (2d ed. 1980). Among prosecutors' unique ethical obligations is the duty to produce *Brady* evidence to the defense. See, *e.g.*, LSBA, Articles of Incorporation, Art. 16, EC 7–13 (1971); ABA Model Rule of Prof. Conduct

3.8(d) (1984).[8]  An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment.  See, *e.g.,* LSBA, Articles of Incorporation, Art. 15, §§5, 6 (1971); *id.*, Art. 16, DR 1–102; ABA Model Rule of Prof. Conduct 8.4 (1984).

In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the "obvious consequence" of failing to provide prosecutors with formal in-house training about how to obey the law. *Bryan Cty.*, 520 U. S., at 409.  Prosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain.  A district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the ab-

───────────

[8]The Louisiana State Bar Code of Professional Responsibility included a broad understanding of the prosecutor's duty to disclose in 1985:

"With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.  Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecution's case or aid the accused." LSBA, Articles of Incorporation, Art. 16, EC 7–13 (1971); see also ABA Model Rule of Prof. Conduct 3.8(d) (1984) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . .").

In addition to these ethical rules, the Louisiana Code of Criminal Procedure, with which Louisiana prosecutors are no doubt familiar, in 1985 required prosecutors, upon order of the court, to permit inspection of evidence "favorable to the defendant . . . which [is] material and relevant to the issue of guilt or punishment,"  La. Code Crim. Proc. Ann., Art. 718 (West 1981) (added 1977), as well as "any results or reports" of "scientific tests or experiments, made in connection with or material to the particular case" if those reports are exculpatory or intended for use at trial, *id.*, Art. 719.

sence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in "the usual and recurring situations with which [the prosecutors] must deal."[9]  *Canton*, 489 U. S., at 391.  A licensed attorney making legal judgments, in his capacity as a prosecutor, about *Brady* material simply does not present the same "highly predictable" constitutional danger as *Canton*'s untrained officer.

A second significant difference between this case and the example in *Canton* is the nuance of the allegedly necessary training.  The *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force.  But it is undisputed here that the prosecutors in Connick's office were familiar with the general *Brady* rule.  Thompson's complaint therefore cannot rely on the utter lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical, but rather must assert that prosecutors were not trained about particular *Brady* evidence or the specific scenario related to the violation in his case.  That sort of nuance simply cannot support an inference of deliberate indifference here.  As the Court said in *Canton*, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  489 U. S., at 392 (citing *Tuttle*, 471 U. S., at 823 (plurality opinion)).

Thompson suggests that the absence of any *formal* training sessions about *Brady* is equivalent to the complete absence of legal training that the Court imagined in

——————

[9] Contrary to the dissent's assertion, see *post*, at 31, n. 26 (citing *post*, at 18–20), a prosecutor's youth is not a "specific reason" not to rely on professional training and ethical obligations.  See *supra*, at 12 (citing *United States* v. *Cronic*, 466 U. S. 648, 658, 664 (1984)).

*Canton*.  But failure-to-train liability is concerned with the substance of the training, not the particular instructional format.  The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States.

We do not assume that prosecutors will always make correct *Brady* decisions or that guidance regarding specific *Brady* questions would not assist prosecutors.  But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.  "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" will not suffice.  *Canton*, *supra*, at 391.  The possibility of single-incident liability that the Court left open in *Canton* is not this case.[10]

2

The dissent rejects our holding that *Canton*'s hypothesized single-incident liability does not, as a legal matter, encompass failure to train prosecutors in their *Brady* obligation.  It would instead apply the *Canton* hypothetical to this case, and thus devotes almost all of its opinion to explaining why the evidence supports liability under that theory.[11]  But the dissent's attempt to address our

—————

[10] Thompson also argues that he proved deliberate indifference by "direct evidence of policymaker fault" and so, presumably, did not need to rely on circumstantial evidence at all.  Brief for Respondent 37.  In support, Thompson contends that Connick created a "culture of indifference" in the district attorney's office, *id.*, at 38, as evidenced by Connick's own allegedly inadequate understanding of *Brady*, the office's unwritten *Brady* policy that was later incorporated into a 1987 handbook, and an officewide "restrictive discovery policy," Brief for Respondent 39–40.  This argument is essentially an assertion that Connick's office had an unconstitutional policy or custom.  The jury rejected this claim, and Thompson does not challenge that finding.

[11] The dissent spends considerable time finding new *Brady* violations

holding—by pointing out that not all prosecutors will necessarily have enrolled in criminal procedure class— misses the point. See *post*, at 29–30. The reason why the *Canton* hypothetical is inapplicable is that attorneys, unlike police officers, are equipped with the tools to find,

————————

in Thompson's trials. See *post*, at 3–13. How these violations are relevant even to the dissent's own legal analysis is "a mystery." *Post*, at 4, n. 2. The dissent does not list these violations among the "[a]bundant evidence" that it believes supports the jury's finding that *Brady* training was obviously necessary. *Post*, at 16. Nor does the dissent quarrel with our conclusion that contemporaneous or subsequent conduct cannot establish a pattern of violations. The only point appears to be to highlight what the dissent sees as sympathetic, even if legally irrelevant, facts.

In any event, the dissent's findings are highly suspect. In finding two of the "new" violations, the dissent belatedly tries to reverse the Court of Appeals' 1998 decision that those *Brady* claims were "without merit." Compare *Thompson* v. *Cain*, 161 F. 3d 802, 806–808 (CA5) (rejecting *Brady* claims regarding the Perkins-Liuzza audiotapes and the Perkins police report), with *post*, at 8–9 (concluding that these were *Brady* violations). There is no basis to the dissent's suggestion that materially new facts have called the Court of Appeals' 1998 decision into question. Cf. *State* v. *Thompson*, 2002–0361, p. 6 (La. App. 7/17/02), 825 So. 2d 552, 555 (noting Thompson's admission that some of his current *Brady* claims "ha[ve] been rejected by both the Louisiana Supreme Court and the federal courts"). Regarding the blood-stained swatch, which the dissent asserts prosecutors "blocked" the defense from inspecting by sending it to the crime lab for testing, *post*, at 6, Thompson's counsel conceded at oral argument that trial counsel had access to the evidence locker where the swatch was recorded as evidence. See Tr. of Oral Arg. 37, 42; Record EX42, EX43 (evidence card identifying "One (1) Piece of Victims [*sic*] Right Pants Leg, W/Blood" among the evidence in the evidence locker and indicating that some evidence had been checked out); Tr. 401 (testimony from Thompson's counsel that he "[w]ent down to the evidence room and checked all of the evidence"); *id.*, at 103, 369– 370, 586, 602 (testimony that evidence card was "available to the public," would have been available to Thompson's counsel, and would have been seen by Thompson's counsel because it was stapled to the evidence bag in "the normal process"). Moreover, the dissent cannot seriously believe that the jury could have found *Brady* violations— indisputably, questions of law. See *post*, at 12, n. 10, 15, n. 11.

interpret, and apply legal principles.

By the end of its opinion, however, the dissent finally reveals that its real disagreement is not with our holding today, but with this Court's precedent. The dissent does not see "any reason," *post*, at 31, for the Court's conclusion in *Bryan County* that a pattern of violations is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train, 520 U. S., at 409. Cf. *id.*, at 406–408 (explaining why a pattern of violations is ordinarily necessary). But cf. *post*, at 30–31 (describing our reliance on *Bryan County* as "imply[ing]" a new "limitation" on §1983). As our precedent makes clear, proving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents "difficult problems of proof," and we must adhere to a "stringent standard of fault," lest municipal liability under §1983 collapse into *respondeat superior*.[12]  *Bryan County*, 520 U. S., at 406, 410; see *Canton*, 489 U. S., at 391–392.

3

The District Court and the Court of Appeals panel erroneously believed that Thompson had proved deliberate indifference by showing the "obviousness" of a need for additional training. They based this conclusion on Connick's awareness that (1) prosecutors would confront

––––––––––

[12] Although the dissent acknowledges that "deliberate indifference liability and *respondeat superior* liability are not one and the same," the opinion suggests that it believes otherwise. *Post*, at 32, n. 28; see, *e.g.*, *post*, at 32 (asserting that "the buck stops with [the district attorney]"); *post*, at 23 (suggesting municipal liability attaches when "the prosecutors" themselves are "deliberately indifferent to what the law requires"). We stand by the longstanding rule—reaffirmed by a unanimous Court earlier this Term—that to prove a violation of §1983, a plaintiff must prove that "the municipality's own wrongful conduct" caused his injury, not that the municipality is ultimately responsible for the torts of its employees. *Los Angeles County* v. *Humphries*, *ante*, at 9; see *Humphries*, *ante*, at 6, 7 (citing *Monell*, 436 U. S., at 691).

*Brady* issues while at the district attorney's office; (2) inexperienced prosecutors were expected to understand *Brady*'s requirements; (3) *Brady* has gray areas that make for difficult choices; and (4) erroneous decisions regarding *Brady* evidence would result in constitutional violations. 553 F. 3d, at 854; App. to Pet. for Cert. 141a, 2005 WL 3541035, \*13. This is insufficient.

It does not follow that, because *Brady* has gray areas and some *Brady* decisions are difficult, prosecutors will so obviously make wrong decisions that failing to train them amounts to "a decision by the city itself to violate the Constitution." *Canton*, 489 U. S., at 395 (O'Connor, J., concurring in part and dissenting in part). To prove deliberate indifference, Thompson needed to show that Connick was on notice that, absent additional specified training, it was "highly predictable" that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result. In fact, Thompson had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights. See *Bryan Cty.*, 520 U. S., at 409; *Canton*, *supra*, at 389. He did not do so.

## III

The role of a prosecutor is to see that justice is done. *Berger* v. *United States*, 295 U. S. 78, 88 (1935). "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Ibid.* By their own admission, the prosecutors who tried Thompson's armed robbery case failed to carry out that responsibility. But the only issue before us is whether Connick, as the policymaker for the district attorney's office, was deliberately indifferent to the need to train the attorneys under his authority.

We conclude that this case does not fall within the

narrow range of "single-incident" liability hypothesized in *Canton* as a possible exception to the pattern of violations necessary to prove deliberate indifference in §1983 actions alleging failure to train. The District Court should have granted Connick judgment as a matter of law on the failure-to-train claim because Thompson did not prove a pattern of similar violations that would "establish that the 'policy of inaction' [was] the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, *supra*, at 395 (opinion of O'Connor, J.).

The judgment of the United States Court of Appeals for the Fifth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 09–571

HARRY F. CONNICK, DISTRICT ATTORNEY, ET AL.,
PETITIONERS *v.* JOHN THOMPSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 29, 2011]

JUSTICE SCALIA, with whom JUSTICE ALITO joins, concurring.

I join the Court's opinion in full. I write separately only to address several aspects of the dissent.

1. The dissent's lengthy excavation of the trial record is a puzzling exertion. The question presented for our review is whether a municipality is liable for a single *Brady* violation by one of its prosecutors, even though no pattern or practice of prior violations put the municipality on notice of a need for specific training that would have prevented it. See *Brady* v. *Maryland*, 373 U. S. 83 (1963). That question is a legal one: whether a *Brady* violation presents one of those rare circumstances we hypothesized in *Canton*'s footnote 10, in which the need for training in constitutional requirements is so obvious *ex ante* that the municipality's failure to provide that training amounts to deliberate indifference to constitutional violations. See *Canton* v. *Harris*, 489 U. S. 378, 390, n. 10 (1989).

The dissent defers consideration of this question until page 23 of its opinion. It first devotes considerable space to allegations that Connick's prosecutors misunderstood *Brady* when asked about it at trial, see *post*, at 16–18 (opinion of GINSBURG, J.), and to supposed gaps in the *Brady* guidance provided by Connick's office to prosecutors, including deficiencies (unrelated to the specific *Brady*

violation at issue in this case) in a policy manual pub-
lished by Connick's office three years after Thompson's
trial, see *post*, at 18–21. None of that is relevant. Thomp-
son's failure-to-train theory at trial was not based on a
pervasive culture of indifference to *Brady*, but rather on
the inevitability of mistakes over enough iterations of
criminal trials. The District Court instructed the jury it
could find Connick deliberately indifferent if:

> "First: The District Attorney was certain that prosecu-
> tors would confront the situation where they would
> have to decide which evidence was required by the
> constitution to be provided to an accused[;]
> "Second: The situation involved a difficult choice, or
> one that prosecutors had a history of mishandling,
> such that additional training, supervision, or monitor-
> ing was clearly needed[; and]
> "Third: The wrong choice by a prosecutor in that
> situation will frequently cause a deprivation of an ac-
> cused's constitutional rights." App. 828.

That theory of deliberate indifference would repeal the
law of *Monell*[1] in favor of the Law of Large Numbers.
*Brady* mistakes are inevitable. So are all species of error
routinely confronted by prosecutors: authorizing a bad
warrant; losing a *Batson*[2] claim; crossing the line in clos-
ing argument; or eliciting hearsay that violates the Con-
frontation Clause. Nevertheless, we do not have "*de facto
respondeat superior* liability," *Canton*, 489 U. S., at 392,
for each such violation under the rubric of failure-to-train
simply because the municipality does not have a profes-
sional educational program covering the specific violation
in sufficient depth.[3] Were Thompson's theory the law,

---

[1] *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658 (1978).
[2] *Batson* v. *Kentucky*, 476 U. S. 79 (1986).
[3] I do not share the dissent's confidence that this result will be
avoided by the instruction's requirement that "'more likely than not the

there would have been no need for *Canton*'s footnote to confine its hypothetical to the extreme circumstance of arming police officers with guns without telling them about the constitutional limitations upon shooting fleeing felons; the District Court's instructions cover every recurring situation in which citizens' rights can be violated.

That result cannot be squared with our admonition that failure-to-train liability is available only in "limited circumstances," *id.*, at 387, and that a pattern of constitutional violations is "ordinarily necessary to establish municipal culpability and causation," *Board of Comm'rs of Bryan Cty.* v. *Brown*, 520 U. S. 397, 409 (1997). These restrictions are indispensable because without them, "failure to train" would become a talismanic incantation producing municipal liability "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee"—which is what *Monell* rejects. *Canton*, 489 U. S., at 392. Worse, it would "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs," thereby diminishing the autonomy of state and local governments. *Ibid.*

2. Perhaps for that reason, the dissent does not seriously contend that Thompson's theory of recovery was proper. Rather, it accuses Connick of acquiescing in that theory at trial. See *post*, at 25. The accusation is false. Connick's central claim was and is that failure-to-train

_____

*Brady* material would have been produced if the prosecutors involved in his underlying criminal cases had been properly trained, supervised or monitored regarding the production of *Brady* evidence.'" *Post*, at 25, n. 17 (quoting Tr. 1100). How comforting that assurance is depends entirely on what proper training consists of. If it is not limited to training in aspects of *Brady* that have been repeatedly violated, but includes—as the dissent would have it include here—training that would avoid any one-time violation, the assurance is no assurance at all.

liability for a *Brady* violation cannot be premised on a
single incident, but requires a pattern or practice of previ-
ous violations. He pressed that argument at the summary
judgment stage but was rebuffed. At trial, when Connick
offered a jury instruction to the same effect, the trial judge
effectively told him to stop bringing up the subject:

> "[Connick's counsel]: Also, as part of that definition
> in that same location, Your Honor, we would like to
> include language that says that deliberate indiffer-
> ence to training requires a pattern of similar viola-
> tions and proof of deliberate indifference requires
> more than a single isolated act.
> "[Thompson's counsel]: That's not the law, Your
> Honor.
> "THE COURT: No, I'm not giving that. That was in
> your motion for summary judgment that I denied."
> Tr. 1013.

Nothing more is required to preserve a claim of error. See
Fed. Rule Civ. Proc. 51(d)(1)(B).[4]

3. But in any event, to recover from a municipality
under 42 U. S. C. §1983, a plaintiff must satisfy a "rigor-
ous" standard of causation, *Bryan Cty.*, 520 U. S., at 405;
he must "demonstrate a direct causal link between the

---

[4] The dissent's contention that "[t]he instruction Connick proposed
resembled the charge given by the District Court," *post*, at 25, n. 18,
disregards his requested instruction concerning the necessity of a
pattern of prior violations. It is meaningless to say that after "the court
rejected [Connick's] categorical position," as it did, he did not "assail the
District Court's formulation of the deliberate indifference instruction,"
*post*, at 26, n. 18. The prior-pattern requirement was *part* of Connick's
requested formulation of deliberate indifference: "To *prove deliberate
indifference*, a plaintiff must demonstrate 'at least a pattern of similar
violations arising from training that is so clearly inadequate as to be
obviously likely to result in a constitutional violation.'" Record, Doc.
94, p. 18 (emphasis added).

municipal action and the deprivation of federal rights." *Id.*, at 404. Thompson cannot meet that standard. The withholding of evidence in his case was almost certainly caused not by a failure to give prosecutors specific training, but by miscreant prosecutor Gerry Deegan's willful suppression of evidence he believed to be exculpatory, in an effort to railroad Thompson. According to Deegan's colleague Michael Riehlmann, in 1994 Deegan confessed to him—in the same conversation in which Deegan revealed he had only a few months to live—that he had "suppressed blood evidence in the armed robbery trial of John Thompson that in some way exculpated the defendant." App. 367; see also *id.*, at 362 ("[Deegan] told me . . . that he had failed to inform the defense of exculpatory information"). I have no reason to disbelieve that account, particularly since Riehlmann's testimony hardly paints a flattering picture of himself: Riehlmann kept silent about Deegan's misconduct for another five years, as a result of which he incurred professional sanctions. See *In re Riehlmann*, 2004–0680 (La. 1/19/05), 891 So. 2d 1239. And if Riehlmann's story is true, then the "moving force," *Bryan Cty.*, *supra,* at 404 (internal quotation marks omitted), behind the suppression of evidence was Deegan, not a failure of continuing legal education.

4. The dissent suspends disbelief about this, insisting that with proper *Brady* training, "surely at least one" of the prosecutors in Thompson's trial would have turned over the lab report and blood swatch. *Post*, at 21. But training must consist of more than mere broad encomiums of *Brady:* We have made clear that "the identified deficiency in a city's training program [must be] closely related to the ultimate injury." *Canton*, *supra*, at 391. So even indulging the dissent's assumption that Thompson's prosecutors failed to disclose the lab report *in good faith*—in a way that could be prevented by training—what sort of

training would have prevented the good-faith nondisclosure of a blood report not known to be exculpatory?

Perhaps a better question to ask is what *legally accurate* training would have prevented it. The dissent's suggestion is to instruct prosecutors to ignore the portion of *Brady* limiting prosecutors' disclosure obligations to evidence that is "favorable to an accused," 373 U. S., at 87. Instead, the dissent proposes that "Connick could have communicated to Orleans Parish prosecutors, in no uncertain terms, that, '[i]f you have physical evidence that, if tested, can establish the innocence of the person who is charged, you have to turn it over.'" *Post*, at 20, n. 13 (quoting Tr. of Oral Arg. 34). Though labeled a training suggestion, the dissent's proposal is better described as a *sub silentio* expansion of the substantive law of *Brady*. If any of our cases establishes such an obligation, I have never read it, and the dissent does not cite it.[5]

Since Thompson's trial, however, we have decided a case that appears to say just the opposite of the training the dissent would require: In *Arizona* v. *Youngblood*, 488 U. S. 51, 58 (1988), we held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." We acknowledged that "*Brady* . . . makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence," but concluded that "the

_____

[5] What the dissent *does* cite in support of its theory comes from an unexpected source: Connick's testimony about what qualifies as *Brady* material. See *post*, at 20–21, n. 13. ("Or Connick could have told prosecutors what he told the jury when he was asked whether a prosecutor must disclose a crime lab report to the defense, even if the prosecutor does not know the defendant's blood type: 'Under the law, it qualifies as *Brady* material.'" (quoting Tr. 872)). Given the effort the dissent has expended persuading us that Connick's understanding of *Brady* is profoundly misguided, its newfound trust in his expertise on the subject is, to the say the least, surprising.

Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.*, at 57. Perhaps one day we will recognize a distinction between good-faith failures to preserve from destruction evidence whose inculpatory or exculpatory character is unknown, and good-faith failures to turn such evidence over to the defense. But until we do so, a failure to train prosecutors to observe that distinction cannot constitute deliberate indifference.

5. By now the reader has doubtless guessed the best-kept secret of this case: There was probably no *Brady* violation at all—except for Deegan's (which, since it was a bad-faith, knowing violation, could not possibly be attributed to lack of training).[6] The dissent surely knows this, which is why it leans heavily on the fact that Connick conceded that *Brady* was violated. I can honor that concession in my analysis of the case because even if it extends beyond Deegan's deliberate actions, it remains irrelevant to Connick's training obligations. For any *Brady* violation apart from Deegan's was surely on the very frontier of our *Brady* jurisprudence; Connick could not possibly have been on notice decades ago that he was required to instruct his prosecutors to respect a right to untested evidence that we had not *(and still have not)*

_____

[6] The dissent's only response to this is that the jury must have found otherwise, since it was instructed that "'[f]or liability to attach because of a failure to train, the fault must be in the training program itself, not in any particular prosecutor.'" *Post*, at 28, n. 20 (quoting Tr. 1098). But this instruction did not require the jury to find that Deegan did not commit a bad-faith, knowing violation; it merely prevented the jury from finding that, if he did so, Connick was liable for a failure to train. I not only agree with that; it is part of my point.

recognized. As a consequence, even if I accepted the dissent's conclusion that failure-to-train liability could be premised on a single *Brady* error, I could not agree that the lack of an accurate training regimen caused the violation Connick has conceded.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–571

———————

## HARRY F. CONNICK, DISTRICT ATTORNEY, ET AL., PETITIONERS *v.* JOHN THOMPSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 29, 2011]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

In *Brady* v. *Maryland*, 373 U. S. 83, 87 (1963), this Court held that due process requires the prosecution to turn over evidence favorable to the accused and material to his guilt or punishment. That obligation, the parties have stipulated, was dishonored in this case; consequently, John Thompson spent 18 years in prison, 14 of them isolated on death row, before the truth came to light: He was innocent of the charge of attempted armed robbery, and his subsequent trial on a murder charge, by prosecutorial design, was fundamentally unfair.

The Court holds that the Orleans Parish District Attorney's Office (District Attorney's Office or Office) cannot be held liable, in a civil rights action under 42 U. S. C. §1983, for the grave injustice Thompson suffered. That is so, the Court tells us, because Thompson has shown only an aberrant *Brady* violation, not a routine practice of giving short shrift to *Brady*'s requirements. The evidence presented to the jury that awarded compensation to Thompson, however, points distinctly away from the Court's assessment. As the trial record in the §1983 action reveals, the conceded, long-concealed prosecutorial transgressions were neither isolated nor atypical.

From the top down, the evidence showed, members of

the District Attorney's Office, including the District At-
torney himself, misperceived *Brady*'s compass and there-
fore inadequately attended to their disclosure obligations.
Throughout the pretrial and trial proceedings against
Thompson, the team of four engaged in prosecuting him
for armed robbery and murder hid from the defense and
the court exculpatory information Thompson requested
and had a constitutional right to receive. The prosecutors
did so despite multiple opportunities, spanning nearly two
decades, to set the record straight. Based on the prosecu-
tors' conduct relating to Thompson's trials, a fact trier
could reasonably conclude that inattention to *Brady* was
standard operating procedure at the District Attorney's
Office.

What happened here, the Court's opinion obscures, was
no momentary oversight, no single incident of a lone offi-
cer's misconduct. Instead, the evidence demonstrated that
misperception and disregard of *Brady*'s disclosure re-
quirements were pervasive in Orleans Parish. That evi-
dence, I would hold, established persistent, deliberately
indifferent conduct for which the District Attorney's Office
bears responsibility under §1983.

I dissent from the Court's judgment mindful that *Brady*
violations, as this case illustrates, are not easily detected.
But for a chance discovery made by a defense team inves-
tigator weeks before Thompson's scheduled execution, the
evidence that led to his exoneration might have remained
under wraps. The prosecutorial concealment Thompson
encountered, however, is bound to be repeated unless
municipal agencies bear responsibility—made tangible by
§1983 liability—for adequately conveying what *Brady*
requires and for monitoring staff compliance. Failure to
train, this Court has said, can give rise to municipal liabil-
ity under §1983 "where the failure . . . amounts to deliber-
ate indifference to the rights of persons with whom the
[untrained employees] come into contact." *Canton* v.

*Harris*, 489 U. S. 378, 388 (1989). That standard is well met in this case.

## I

I turn first to a contextual account of the *Brady* violations that infected Thompson's trials.

## A

In the early morning hours of December 6, 1984, an assailant shot and killed Raymond T. Liuzza, Jr., son of a prominent New Orleans business executive, on the street fronting the victim's home. Only one witness saw the assailant. As recorded in two contemporaneous police reports, that eyewitness initially described the assailant as African-American, six feet tall, with "close cut hair." Record EX2–EX3, EX9.[1] Thompson is five feet eight inches tall and, at the time of the murder, styled his hair in a large "Afro." *Id.*, at EX13. The police reports of the witness' immediate identification were not disclosed to Thompson or to the court.

While engaged in the murder investigation, the Orleans Parish prosecutors linked Thompson to another violent crime committed three weeks later. On December 28, an assailant attempted to rob three siblings at gunpoint. During the struggle, the perpetrator's blood stained the oldest child's pant leg. That blood, preserved on a swatch of fabric cut from the pant leg by a crime scene analyst, was eventually tested. The test conclusively established that the perpetrator's blood was type B. *Id.*, at EX151. Thompson's blood is type O. His prosecutors failed to disclose the existence of the swatch or the test results.

---

[1] Exhibits entered into evidence in Thompson's §1983 trial are herein cited by reference to the page number in the exhibit binder compiled by the District Court and included in the record on appeal.

B

One month after the Liuzza murder, Richard Perkins, a man who knew Thompson, approached the Liuzza family. Perkins did so after the family's announcement of a $15,000 reward for information leading to the murderer's conviction. Police officers surreptitiously recorded the Perkins-Liuzza conversations.[2] As documented on tape, Perkins told the family, "I don't mind helping [you] catch [the perpetrator], . . . but I would like [you] to help me and, you know, I'll help [you]." *Id.*, at EX479, EX481. Once the family assured Perkins, "we're on your side, we want to try and help you," *id.*, at EX481, Perkins intimated that Thompson and another man, Kevin Freeman, had been involved in Liuzza's murder. Perkins thereafter told the police what he had learned from Freeman about the murder, and that information was recorded in a police report. Based on Perkins' account, Thompson and Freeman were arrested on murder charges.

Freeman was six feet tall and went by the name "Kojak" because he kept his hair so closely trimmed that his scalp was visible. Unlike Thompson, Freeman fit the eyewitness' initial description of the Liuzza assailant's height and hair style. As the Court notes, *ante*, at 4, n. 2, Freeman became the key witness for the prosecution at Thompson's trial for the murder of Liuzza.

After Thompson's arrest for the Liuzza murder, the father of the armed robbery victims saw a newspaper photo of Thompson with a large Afro hairstyle and showed

_____

[2] The majority endorses the Fifth Circuit's conclusion that, when Thompson was tried for murder, no *Brady* violation occurred with respect to these audio tapes "[b]ecause defense counsel had knowledge of such evidence and could easily have requested access from the prosecution." *Thompson* v. *Cain*, 161 F. 3d 802, 806–807 (1998); *ante*, at 17, n. 11. The basis for that asserted "knowledge" is a mystery. The recordings secretly made did not come to light until long after Thompson's trials.

it to his children. He reported to the District Attorney's Office that the children had identified Thompson as their attacker, and the children then picked that same photo out of a "photographic lineup." Record EX120, EX642– EX643. Indicting Thompson on the basis of these questionable identifications, the District Attorney's Office did not pause to test the pant leg swatch dyed by the perpetrator's blood. This lapse ignored or overlooked a prosecutor's notation that the Office "may wish to do [a] blood test." *Id.*, at EX122.

The murder trial was scheduled to begin in mid-March 1985. Armed with the later indictment against Thompson for robbery, however, the prosecutors made a strategic choice: They switched the order of the two trials, proceeding first on the robbery indictment. *Id.*, at EX128–EX129. Their aim was twofold. A robbery conviction gained first would serve to inhibit Thompson from testifying in his own defense at the murder trial, for the prior conviction could be used to impeach his credibility. In addition, an armed robbery conviction could be invoked at the penalty phase of the murder trial in support of the prosecution's plea for the death penalty. *Id.*, at 682.

Recognizing the need for an effective prosecution team, petitioner Harry F. Connick, District Attorney for the Parish of Orleans, appointed his third-in-command, Eric Dubelier, as special prosecutor in both cases. Dubelier enlisted Jim Williams to try the armed robbery case and to assist him in the murder case. Gerry Deegan assisted Williams in the armed robbery case. Bruce Whittaker, the fourth prosecutor involved in the cases, had approved Thompson's armed robbery indictment.[3]

---

[3] At the time of their assignment, Dubelier had served in the District Attorney's Office for three and a half years, Williams, for four and a half years, Deegan, a recent law school graduate, for less than one year, and Whittaker, for three years.

## C

During pretrial proceedings in the armed robbery case, Thompson filed a motion requesting access to all materials and information "favorable to the defendant" and "material and relevant to the issue of guilt or punishment," as well as "any results or reports" of "scientific tests or experiments." *Id.*, at EX144, EX145. Prosecutorial responses to this motion fell far short of *Brady* compliance.[4]

First, prosecutors blocked defense counsel's inspection of the pant leg swatch stained by the robber's blood. Although Dubelier's April 3 response stated, "Inspection to be permitted," *id.*, at EX149, the swatch was signed out from the property room at 10:05 a.m. the next day, and was not returned until noon on April 10, the day before trial, *id.*, at EX43, EX670. Thompson's attorney inspected the evidence made available to him and found no blood evidence. No one told defense counsel about the swatch and its recent removal from the property room. *Id.*, at EX701–EX702; Tr. 400–402. But cf. *ante*, at 17, n. 11 (Thompson's attorney had "access to the evidence locker where the swatch was recorded as evidence.").[5]

––––––––––

[4] Connick did not dispute that failure to disclose the swatch and the crime lab report violated *Brady*. See Tr. 46, 1095. But cf. *ante*, at 4, 6 (limiting Connick's concession, as Connick himself did not, to failure to disclose the crime lab report).

In JUSTICE SCALIA's contrary view, "[t]here was probably no *Brady* violation at all," or, if there was any violation of Thompson's rights, it "was surely on the very frontier of our *Brady* jurisprudence," such that "Connick could not possibly have been on notice" of the need to train. *Ante*, at 7. Connick's counsel, however, saw the matter differently. "[A]ny reasonable prosecutor would have recognized blood evidence as *Brady* material," he said, indeed "the proper response" was "obvious to all." Record 1663, 1665.

[5] The majority assails as "highly suspect" the suggestion that prosecutors violated *Brady* by failing to disclose the blood-stained swatch. See *ante*, at 17, n. 11. But the parties stipulated in Thompson's §1983 action, and the jury was so informed, that, "[p]rior to the armed robbery trial, Mr. Thompson and his attorneys were not advised of the existence

Second, Dubelier or Whittaker ordered the crime laboratory to rush a pretrial test of the swatch. Tr. 952–954. Whittaker received the lab report, addressed to his attention, two days before trial commenced. Immediately thereafter, he placed the lab report on Williams' desk. Record EX151, EX589. Although the lab report conclusively identified the perpetrator's blood type, *id.*, at EX151, the District Attorney's Office never revealed the report to the defense.[6]

Third, Deegan checked the swatch out of the property room on the morning of the first day of trial, but the prosecution did not produce the swatch at trial. *Id.*, at EX43. Deegan did not return the swatch to the property room after trial, and the swatch has never been found. Tr. of Oral Arg. 37.

"[B]ased solely on the descriptions" provided by the three victims, Record 683, the jury convicted Thompson of attempted armed robbery. The court sentenced him to 49.5 years without possibility of parole—the maximum available sentence.

### D

Prosecutors continued to disregard *Brady* during the

_____

of the blood evidence, that the evidence had been tested, [or] that a blood type was determined definitively from the swatch . . . ." Tr. 46. Consistent with this stipulation, Thompson's trial counsel testified that he spoke to "[t]he clerk who maintain[ed] the evidence" and learned that "[t]hey didn't have any blood evidence." *Id.*, at 401. And the District Court instructed the jury, with no objection from Connick, "that the nonproduced blood evidence . . . violated [Thompson's] constitutional rights as a matter of law." *Id.*, at 1095.

[6] JUSTICE SCALIA questions petitioners' concession that *Brady* was violated when the prosecution failed to inform Thompson of the blood evidence. He considers the evidence outside *Brady* because the prosecution did not endeavor to test Thompson's blood, and therefore avoided knowing that the evidence was in fact exculpatory. *Ante*, at 6–7. Such a "don't ask, don't tell" view of a prosecutor's *Brady* obligations garners no support from precedent. See also *supra*, at 6, n. 4; *infra*, at 21, n. 13.

murder trial, held in May 1985, at which the prosecution's order-of-trial strategy achieved its aim.[7]   By prosecuting Thompson for armed robbery first—and withholding blood evidence that might have exonerated Thompson of that charge—the District Attorney's Office disabled Thompson from testifying in his own defense at the murder trial.[8]   As earlier observed, see *supra*, at 5, impeaching use of the prior conviction would have severely undermined Thompson's credibility.   And because Thompson was effectively stopped from testifying in his own defense, the testimony of the witnesses against him gained force.   The prosecution's failure to reveal evidence that could have impeached those witnesses helped to seal Thompson's fate.

First, the prosecution undermined Thompson's efforts to impeach Perkins.   Perkins testified that he volunteered information to the police with no knowledge of reward money.   Record EX366, EX372–EX373.   Because prosecutors had not produced the audiotapes of Perkins' conversations with the Liuzza family (or a police summary of the tapes), Thompson's attorneys could do little to cast doubt on Perkins' credibility.   In closing argument, the prosecution emphasized that Thompson presented no "direct evidence" that reward money had motivated any of the witnesses.   *Id.*, at EX3171–EX3172.

Second, the prosecution impeded Thompson's impeachment of key witness Kevin Freeman.   It did so by failing to disclose a police report containing Perkins' account of

_____

[7] During jury deliberations in the armed robbery case, Williams, the only Orleans Parish trial attorney common to the two prosecutions, told Thompson of his objective in no uncertain terms: "I'm going to fry you. You will die in the electric chair."   Tr. 252–253.

[8] The Louisiana Court of Appeal concluded, and Connick does not dispute, that Thompson "would have testified in the absence of the attempted armed robbery conviction."   *State* v. *Thompson*, 2002–0361, p. 7 (7/17/02), 825 So. 2d 552, 556.   But cf. *ante*, at 1, 3 (Thompson "elected" not to testify).

what he had learned from Freeman about the murder. See *supra*, at 4. Freeman's trial testimony was materially inconsistent with that report. Tr. 382–384, 612–614; Record EX270–EX274. Lacking any knowledge of the police report, Thompson could not point to the inconsistencies.

Third, and most vital, the eyewitness' initial description of the assailant's hair, see *supra*, at 3, was of prime relevance, for it suggested that Freeman, not Thompson, murdered Liuzza, see *supra*, at 4. The materiality of the eyewitness' contemporaneous description of the murderer should have been altogether apparent to the prosecution. Failure to produce the police reports setting out what the eyewitness first said not only undermined efforts to impeach that witness and the police officer who initially interviewed him. The omission left defense counsel without knowledge that the prosecutors were restyling the killer's "close cut hair" into an "Afro."

Prosecutors finessed the discrepancy between the eyewitness' initial description and Thompson's appearance. They asked leading questions prompting the eyewitness to agree on the stand that the perpetrator's hair was "afro type," yet "straight back." Record EX322–EX323. Corroboratively, the police officer—after refreshing his recollection by reviewing material at the prosecution's table—gave artful testimony. He characterized the witness' initial description of the perpetrator's hair as "black and short, *afro style*." *Id.*, at EX265 (emphasis added). As prosecutors well knew, nothing in the withheld police reports, which described the murderer's hair simply as "close cut," portrayed a perpetrator with an Afro or Afro-style hair.

The jury found Thompson guilty of first-degree murder. Having prevented Thompson from testifying that Freeman was the killer, the prosecution delivered its ultimate argument. Because Thompson was already serving a

near-life sentence for attempted armed robbery, the prosecution urged, the only way to punish him for murder was to execute him. The strategy worked as planned; Thompson was sentenced to death.

### E

Thompson discovered the prosecutors' misconduct through a serendipitous series of events. In 1994, nine years after Thompson's convictions, Deegan, the assistant prosecutor in the armed robbery trial, learned he was terminally ill. Soon thereafter, Deegan confessed to his friend Michael Riehlmann that he had suppressed blood evidence in the armed robbery case. *Id.*, at EX709. Deegan did not heed Riehlmann's counsel to reveal what he had done. For five years, Riehlmann, himself a former Orleans Parish prosecutor, kept Deegan's confession to himself. *Id.*, at EX712–EX713.

On April 16, 1999, the State of Louisiana scheduled Thompson's execution. *Id.*, at EX1366–EX1367. In an eleventh-hour effort to save his life, Thompson's attorneys hired a private investigator. Deep in the crime lab archives, the investigator unearthed a microfiche copy of the lab report identifying the robber's blood type. The copy showed that the report had been addressed to Whittaker. See *supra*, at 7. Thompson's attorneys contacted Whittaker, who informed Riehlmann that the lab report had been found. Riehlmann thereupon told Whittaker that Deegan "had failed to turn over stuff that might have been exculpatory." Tr. 718. Riehlmann prepared an affidavit describing Deegan's disclosure "that he had intentionally suppressed blood evidence in the armed robbery trial of John Thompson." Record EX583.

Thompson's lawyers presented to the trial court the crime lab report showing that the robber's blood type was B, and a report identifying Thompson's blood type as O. This evidence proved Thompson innocent of the robbery.

The court immediately stayed Thompson's execution, *id.*, at EX590, and commenced proceedings to assess the newly discovered evidence.

Connick sought an abbreviated hearing. A full hearing was unnecessary, he urged, because the Office had confessed error and had moved to dismiss the armed robbery charges. See, *e.g.*, *id.*, at EX617. The court insisted on a public hearing. Given "the history of this case," the court said, it "was not willing to accept the representations that [Connick] and [his] office made [in their motion to dismiss]." *id.*, at EX882. After a full day's hearing, the court vacated Thompson's attempted armed robbery conviction and dismissed the charges. Before doing so, the court admonished:

> "[A]ll day long there have been a number of young Assistant D. A.'s . . . sitting in this courtroom watching this, and I hope they take home . . . and take to heart the message that this kind of conduct cannot go on in this Parish if this Criminal Justice System is going to work." *Id.*, at EX883.

The District Attorney's Office then initiated grand jury proceedings against the prosecutors who had withheld the lab report. Connick terminated the grand jury after just one day. He maintained that the lab report would not be *Brady* material if prosecutors did not know Thompson's blood type. Tr. 986; cf. *supra*, at 7, n. 6. And he told the investigating prosecutor that the grand jury "w[ould] make [his] job more difficult." Tr. 978–979. In protest, that prosecutor tendered his resignation.

## F

Thereafter, the Louisiana Court of Appeal reversed Thompson's murder conviction. *State* v. *Thompson*, 2002–0361, p. 10 (7/17/02), 825 So. 2d 552, 558. The unlawfully procured robbery conviction, the court held, had violated

Thompson's right to testify and thus fully present his defense in the murder trial. *Id.*, at 557. The merits of several *Brady* claims arising out of the murder trial, the court observed, had therefore become "moot." 825 So. 2d, at 555; see also Record 684.[9] But cf. *ante*, at 10–11, n. 7, 16–17, n. 11 (suggesting that there were no *Brady* violations in the murder prosecution because no court had adjudicated any violations).[10]

————————

[9] Thompson argued that "the State failed to produce police reports 'and other information' which would have identified 'eye- and ear-witnesses' whose testimony would have exonerated him and inculpated [Freeman], . . . and would have shown that [Perkins,] . . . who stated [he] heard [Thompson] admit to committing the murder[,] had been promised reward money for [his] testimony." *Thompson*, 825 So. 2d, at 555. In leaving these arguments unaddressed, the Louisiana Court of Appeal surely did not defer to the Fifth Circuit's earlier assessment of those claims, made on an anemic record, in *Thompson* v. *Cain*, 161 F. 3d 802. Nor did the Louisiana Court of Appeal suggest that Thompson was "belatedly tr[ying] to reverse" the Fifth Circuit's decision. But cf. *ante*, at 17, n. 11.

[10] The Court notes that in *Thompson* v. *Cain*, the Fifth Circuit rejected *Brady* claims raised by Thompson, characterizing one of those claims as "without merit." *Ante*, at 17, n. 11 (quoting *Thompson*, 161 F. 3d, at 807); see *supra*, at 4, n. 2. The Court, however, overlooks the date of that Fifth Circuit decision. It was rendered before revelation of the *Brady* violations in the armed robbery trial, before Thompson had the opportunity for discovery in his §1983 suit, and before Thompson or any court was aware of the "close cut hair" police reports. See *Thompson*, 161 F. 3d, at 812, n. 8. It is these later revelations, not the little Thompson knew in 1998, that should count. For example, the Fifth Circuit, in 1998, believed that Perkins' statement recorded in the police report did not "differ from Freeman's trial testimony." *Id.*, at 808. But evidence put before the jury in 2007 in the §1983 trial showed that the police report, in several material respects, was inconsistent with Freeman's trial testimony. Tr. 382–383.

Connick has never suggested to this Court that the jury in the §1983 trial was bound by the Fifth Circuit's 1998 *Brady* rulings. That court "afford[ed] great deference to" the state trial court's findings, made after a 1995 post-conviction relief hearing. *Thompson*, 161 F. 3d, at 805. The jury in the §1983 trial, of course, had far more extensive and accurate information on which to reach its decision. Moreover, as

Undeterred by his assistants' disregard of Thompson's rights, Connick retried him for the Liuzza murder. Thompson's defense was bolstered by evidence earlier unavailable to him: ten exhibits the prosecution had not disclosed when Thompson was first tried. The newly produced items included police reports describing the assailant in the murder case as having "close cut" hair, the police report recounting Perkins' meetings with the Liuzza family, see *supra*, at 3–4, audio recordings of those meetings, and a 35-page supplemental police report. After deliberating for only 35 minutes, the jury found Thompson not guilty.

On May 9, 2003, having served more than 18 years in prison for crimes he did not commit, Thompson was released.

## II

On July 16, 2003, Thompson commenced a civil action under 42 U. S. C. §1983 alleging that Connick, other officials of the Orleans Parish District Attorney's Office, and the Office itself, had violated his constitutional rights by wrongfully withholding *Brady* evidence. Thompson sought to hold Connick and the District Attorney's Office liable for failure adequately to train prosecutors concerning their *Brady* obligations. Such liability attaches, I agree with the Court, only when the failure "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Ante*, at 9 (quoting *Canton* v. *Harris*, 489 U. S. 378, 388 (1989)). I disagree, however, with the Court's conclusion that

_____

earlier noted, the same trial court that made the 1995 findings was, in 1999, outraged by the subsequently discovered *Brady* violations and by Connick's reluctance to bring those violations to light. See *supra*, at 10–11. Certainly that judge would not have wanted the jury that assessed Connick's deliberate indifference in the §1983 trial to defer to findings he earlier made on a notably incomplete record.

Thompson failed to prove deliberate indifference.

Having weighed all the evidence, the jury in the §1983 case found for Thompson, concluding that the District Attorney's Office had been deliberately indifferent to Thompson's *Brady* rights and to the need for training and supervision to safeguard those rights. "Viewing the evidence in the light most favorable to [Thompson], as appropriate in light of the verdic[t] rendered by the jury," *Patrick* v. *Burget*, 486 U. S. 94, 98, n. 3 (1988), I see no cause to upset the District Court's determination, affirmed by the Fifth Circuit, that "ample evidence . . . adduced at trial" supported the jury's verdict. Record 1917.

Over 20 years ago, we observed that a municipality's failure to provide training may be so egregious that, even without notice of prior constitutional violations, the failure "could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 489 U. S., at 390, n. 10. "[I]n light of the duties assigned to specific officers or employees," *Canton* recognized, "it may happen that . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.*, at 390. Thompson presented convincing evidence to satisfy this standard.

### A

Thompson's §1983 suit proceeded to a jury trial on two theories of liability: First, the Orleans Parish Office's official *Brady* policy was unconstitutional; and second, Connick was deliberately indifferent to an obvious need to train his prosecutors about their *Brady* obligations. Connick's *Brady* policy directed prosecutors to "turn over what was required by state and federal law, but no more." Brief for Petitioners 6–7. The jury thus understandably rejected Thompson's claim that the official policy itself was uncon-

stitutional. *Ante*, at 5.

The jury found, however, that Connick was deliberately indifferent to the need to train prosecutors about *Brady*'s command. On the special verdict form, the jury answered yes to the following question:

> "Was the *Brady* violation in the armed robbery case or any infringements of John Thompson's rights in the murder trial substantially caused by [Connick's] failure, through deliberate indifference, to establish policies and procedures to protect one accused of a crime from these constitutional violations?" Record 1585.

Consistent with the question put to the jury, and without objection, the court instructed the jurors: "[Y]ou are not limited to the nonproduced blood evidence and the resulting infringement of Mr. Thompson's right to testify at the murder trial. You may consider all of the evidence presented during this trial." Tr. 1099; Record 1620.[11] But

————————

[11] The court permitted Thompson to introduce evidence of other *Brady* violations, but because "the blood evidence alone proved the violation [of Thompson's constitutional rights]," the court declined specifically "to ask the jury [whether] this other stuff [was] also *Brady*." Tr. 1003. The court allowed Thompson to submit proof of other violations to "sho[w] the cumulative nature . . . and impact [of] evidence . . . as to . . . the training and deliberate indifference . . . ." *Ibid.* But cf. *ante*, at 17, n. 11 (questioning how "these violations are relevant" to this case). Far from indulging in my own factfindings, but cf. *ante*, at 16–17, n. 11, I simply recite the evidence supporting the jury's verdict in Thompson's §1983 trial.

The Court misleadingly states that "the District Court instructed the jury that the 'only issue' was whether the nondisclosure [of the crime lab report] was caused by either a policy, practice, or custom of the district attorney's office or a deliberately indifferent failure to train the office's prosecutors." *Ante*, at 4. The jury instruction the majority cites simply directed the jury that, with regard to the blood evidence, as a matter of law, Thompson's constitutional rights had been violated. Record 1614–1615. The court did not preclude the jury from assessing evidence of other infringements of Thompson's rights. *Id.*, at 1585; see *Kyles* v. *Whitley*, 514 U. S. 419, 421 (1995) ("[T]he state's obligation

cf. *ante*, at 2, 6, 10, n. 7, 16; *ante*, at 1 (SCALIA, J., concur-
ring) (maintaining that the case involves a single *Brady*
violation). That evidence included a stipulation that in his
retrial for the Liuzza murder, Thompson had introduced
ten exhibits containing relevant information withheld by
the prosecution in 1985. See *supra*, at 13.

Abundant evidence supported the jury's finding that
additional *Brady* training was obviously necessary to
ensure that *Brady* violations would not occur: (1) Connick,
the Office's sole policymaker, misunderstood *Brady*. (2)
Other leaders in the Office, who bore direct responsibility
for training less experienced prosecutors, were similarly
uninformed about *Brady*. (3) Prosecutors in the Office
received no *Brady* training. (4) The Office shirked its
responsibility to keep prosecutors abreast of relevant legal
developments concerning *Brady* requirements. As a result
of these multiple shortfalls, it was hardly surprising that
*Brady* violations in fact occurred, severely undermining
the integrity of Thompson's trials.

1

Connick was the Office's sole policymaker, and his
testimony exposed a flawed understanding of a prosecu-
tor's *Brady* obligations. First, Connick admitted to the
jury that his earlier understanding of *Brady*, conveyed in
prior sworn testimony, had been too narrow. Tr. 181–182.
Second, Connick confessed to having withheld a crime lab
report "one time as a prosecutor and I got indicted by the
U. S. Attorney over here for doing it." *Id.*, at 872. Third,
even at trial Connick persisted in misstating *Brady*'s
requirements. For example, Connick urged that there
could be no *Brady* violation arising out of "the inadvertent
conduct of [an] assistant under pressure with a lot of case

———

under *Brady* . . . turns on the cumulative effect of all . . . evidence
suppressed by the government . . . .").

load." Tr. 188–189. The court, however, correctly instructed the jury that, in determining whether there has been a *Brady* violation, the "good or bad faith of the prosecution does not matter." Tr. 1094–1095.

2

The testimony of other leaders in the District Attorney's Office revealed similar misunderstandings. Those misunderstandings, the jury could find, were in large part responsible for the gross disregard of *Brady* rights Thompson experienced. Dubelier admitted that he never reviewed police files, but simply relied on the police to flag any potential *Brady* information. Tr. 542. The court, however, instructed the jury that an individual prosecutor has a "duty . . . to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Id.*, at 1095; Record 1614. Williams was asked whether "*Brady* material includes documents in the possession of the district attorney that could be used to impeach a witness, to show that he's lying"; he responded simply, and mistakenly, "No." Tr. 381. The testimony of "high-ranking individuals in the Orleans Parish District Attorney's Office," Thompson's expert explained,[12] exposed "complete errors . . . as to what *Brady* required [prosecutors] to do." *Id.*, at 427, 434. "Dubelier had no understanding of his obligations under *Brady* whatsoever," *id.*, at 458, the expert observed, and Williams "is still not sure

─────────────

[12] With no objection from petitioners, the court found Thompson's expert, Joseph Lawless, qualified to testify as an expert in criminal law and procedure. Tr. 419, 426. Lawless has practiced criminal law for 30 years; from 1976 to 1979, he was an assistant district attorney, and thereafter he entered private practice. *Id.*, at 412. He is the author of Prosecutorial Misconduct: Law, Procedure, Forms (4th ed. 2008), first published in 1985. Tr. 414. The text is used in a class on ethics and tactics for the criminal lawyer at Harvard Law School and in the federal defender training program of the Administrative Office of the United States Courts. *Id.*, at 416.

what his obligations were under *Brady*," *id.*, at 448. But cf. *ante*, at 4–5 ("[I]t was undisputed at trial that the prosecutors were familiar with the general *Brady* requirement that the State disclose to the defense evidence in its possession that is favorable to the accused.").

The jury could attribute the violations of Thompson's rights directly to prosecutors' misapprehension of *Brady*. The prosecution had no obligation to produce the "close-cut hair" police reports, Williams maintained, because newspaper reports had suggested that witness descriptions were not consistent with Thompson's appearance. Therefore, Williams urged, the defense already "had everything." Tr. 139. Dubelier tendered an alternative explanation for the nondisclosure. In Dubelier's view, the descriptions were not "inconsistent with [Thompson's] appearance," as portrayed in a police photograph showing Thompson's hair extending at least three inches above his forehead. *Id.*, at 171–172; Record EX73. Williams insisted that he had discharged the prosecution's duty to disclose the blood evidence by mentioning, in a motion hearing, that the prosecution intended to obtain a blood sample from Thompson. Tr. 393–394. During the armed robbery trial, Williams told one of the victims that the results of the blood test made on the swatch had been "inconclusive." *Id.*, at 962. And he testified in the §1983 action that the lab report was not *Brady* material "because I didn't know what the blood type of Mr. Thompson was." Tr. 393. But see *supra*, at 6–7, n. 5 (District Court instructed the jury that the lab report was *Brady* material).

3

Connick should have comprehended that Orleans Parish prosecutors lacked essential guidance on *Brady* and its application. In fact, Connick has effectively conceded that *Brady* training in his Office was inadequate. Tr. of Oral Arg. 60. Connick explained to the jury that prosecutors'

offices must "make . . . very clear to [new prosecutors] what their responsibility [i]s" under *Brady* and must not "giv[e] them a lot of leeway." Tr. 834–835. But the jury heard ample evidence that Connick's Office gave prosecutors no *Brady* guidance, and had installed no procedures to monitor *Brady* compliance.

In 1985, Connick acknowledged, many of his prosecutors "were coming fresh out of law school," and the Office's "[h]uge turnover" allowed attorneys with little experience to advance quickly to supervisory positions. See Tr. 853–854, 832. By 1985, Dubelier and Williams were two of the highest ranking attorneys in the Office, *id.*, at 342, 356–357, yet neither man had even five years of experience as a prosecutor, see *supra*, at 5, n. 3; Record EX746; Tr. 55, 571–576.

Dubelier and Williams learned the prosecutorial craft in Connick's Office, and, as earlier observed, see *supra*, at 17–18, their testimony manifested a woefully deficient understanding of *Brady*. Dubelier and Williams told the jury that they did not recall any *Brady* training in the Office. Tr. 170–171, 364.

Connick testified that he relied on supervisors, including Dubelier and Williams, to ensure prosecutors were familiar with their *Brady* obligations. Tr. 805–806. Yet Connick did not inquire whether the supervisors themselves understood the importance of teaching newer prosecutors about *Brady*. Riehlmann could not "recall that [he] was ever trained or instructed by anybody about [his] *Brady* obligations," on the job or otherwise. Tr. 728–729. Whittaker agreed it was possible for "inexperienced lawyers, just a few weeks out of law school with no training," to bear responsibility for "decisions on . . . whether material was *Brady* material and had to be produced." *Id.*, at 319.

Thompson's expert characterized Connick's supervision regarding *Brady* as "the blind leading the blind." Tr. 458.

For example, in 1985 trial attorneys "sometimes . . . went to Mr. Connick" with *Brady* questions, "and he would tell them" how to proceed. Tr. 892. But Connick acknowledged that he had "stopped reading law books . . . and looking at opinions" when he was first elected District Attorney in 1974. *Id.*, at 175–176.

As part of their training, prosecutors purportedly attended a pretrial conference with the Office's chief of trials before taking a case to trial. Connick intended the practice to provide both training and accountability. But it achieved neither aim in Thompson's prosecutions, for Dubelier and Williams, as senior prosecutors in the Office, were free to take cases to trial without pretrying them, and that is just how they proceeded in Thompson's prosecutions. *Id.*, at 901–902; Record 685. But cf. *ante*, at 13 ("[T]rial chiefs oversaw the preparation of the cases.").

Prosecutors confirmed that training in the District Attorney's Office, overall, was deficient. Soon after Connick retired, a survey of assistant district attorneys in the Office revealed that more than half felt that they had not received the training they needed to do their jobs. Tr. 178.

Thompson, it bears emphasis, is not complaining about the absence of formal training sessions. Tr. of Oral Arg. 55. But cf. *ante*, at 15–16. His complaint does not demand that *Brady* compliance be enforced in any particular way. He asks only that *Brady* obligations be communicated accurately and genuinely enforced.[13] Because that did not

---

[13] To ward off *Brady* violations of the kind Connick conceded, for example, Connick could have communicated to Orleans Parish prosecutors, in no uncertain terms, that, "[i]f you have physical evidence that, if tested, can establish the innocence of the person who is charged, you have to turn it over." Tr. of Oral Arg. 34; *id.*, at 36 ("[I]f you have evidence that can conclusively establish to a scientific certainty the innocence of the person being charged, you have to turn it over . . . ."). Or Connick could have told prosecutors what he told the jury when he was asked whether a prosecutor must disclose a crime lab report to the defense, even if the prosecutor does not know the defendant's blood

happen in the District Attorney's Office, it was inevitable that prosecutors would misapprehend *Brady*. Had *Brady*'s importance been brought home to prosecutors, surely at least one of the four officers who knew of the swatch and lab report would have revealed their existence to defense counsel and the court.[14]

4

Louisiana did not require continuing legal education at the time of Thompson's trials. Tr. 361. But cf. *ante*, at 12–13. Primary responsibility for keeping prosecutors *au courant* with developments in the law, therefore, resided in the District Attorney's Office. Over the course of Connick's tenure as District Attorney, the jury learned, the Office's chief of appeals circulated memoranda when appellate courts issued important opinions. Tr. 751–754, 798.

The 1987 Office policy manual was a compilation of memoranda on criminal law and practice circulated to prosecutors from 1974, when Connick became District Attorney, through 1987. *Id.*, at 798. The manual contained four sentences, nothing more, on *Brady*.[15] This

_____

type: "Under the law it qualifies as *Brady* material. Under Louisiana law we must turn that over. Under *Brady* we must turn that over. I [failed to disclose a crime lab report] one time as a prosecutor and I got indicted by the U. S. Attorney over here for doing it." Tr. 872. But cf. *ante*, at 7 (SCALIA, J., concurring) (questioning how Connick could have been on notice of the need to train prosecutors about the *Brady* violations conceded in this case).

[14] The Court can scarcely disagree with respect to Dubelier, Williams, and Whittaker, for it acknowledges the "flagran[cy]" of Deegan's conduct, see *ante*, at 7, n. 5, and does not dispute that, pretrial, other prosecutors knew of the existence of the swatch and lab report.

[15] Section 5.25 of the manual, titled "*Brady* Material," states in full: "In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so called *Brady* material—that is, information in the possession of the State which is exculpatory regarding the defendant. The duty to produce *Brady* material is ongoing and

slim instruction, the jury learned, was notably inaccurate, incomplete, and dated. Tr. 798–804, 911–918. But cf. *ante*, at 13 ("Senior attorneys also circulated court decisions and instructional memoranda to keep the prosecutors abreast of relevant legal developments."). For example, the manual did not acknowledge what *Giglio* v. *United States*, 405 U. S. 150 (1972), made plain: Impeachment evidence is *Brady* material prosecutors are obligated to disclose.[16]

––––––––––

continues throughout the entirety of the trial. Failure to produce *Brady* material has resulted in mistrials and reversals, as well as extended court battles over jeopardy issues. In all cases, a review of *Brady* issues, including apparently self-serving statements made by the defendant, must be included in a pre-trial conference and each Assistant must be familiar with the law regarding exculpatory information possessed by the State." Record EX427.

[16]During the relevant time period, there were many significant developments in this Court's *Brady* jurisprudence. Among the *Brady*-related decisions this Court handed down were *United States* v. *Bagley*, 473 U. S. 667, 676 (1985) ("This Court has rejected any . . . distinction between impeachment evidence and exculpatory evidence [in the *Brady* context]."); *Weatherford* v. *Bursey*, 429 U. S. 545, 559–560 (1977) ("*Brady* is not implicated . . . where the only claim is that the State should have revealed that it would present the eyewitness testimony of a particular agent against the defendant at trial."); and *United States* v. *Agurs*, 427 U. S. 97, 103, 104, 106–107 (1976) (*Brady* claim may arise when "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," when defense counsel makes "a pretrial request for specific evidence" and the government fails to accede to that request, and when defense counsel makes no request and the government fails to disclose "obviously exculpatory" evidence). These decisions were not referenced in the manual that compiled circulated memoranda.

In the same period, the Louisiana Supreme Court issued dozens of opinions discussing *Brady*, including *State* v. *Sylvester*, 388 So. 2d 1155, 1161 (1980) (impeachment evidence must be disclosed in response to a specific request if it would create a "reasonable doubt that did not otherwise exist"); *State* v. *Brooks*, 386 So. 2d 1348, 1351 (1980) (*Brady* extends to any material information favorable to the accused); and *State* v. *Carney*, 334 So. 2d 415, 418–419 (1976) (reversible error if

In sum, the evidence permitted the jury to reach the following conclusions. First, Connick did not ensure that prosecutors in his Office knew their *Brady* obligations; he neither confirmed their familiarity with *Brady* when he hired them, nor saw to it that training took place on his watch. Second, the need for *Brady* training and monitoring was obvious to Connick. Indeed he so testified. Third, Connick's cavalier approach to his staff's knowledge and observation of *Brady* requirements contributed to a culture of inattention to *Brady* in Orleans Parish.

As earlier noted, see *supra*, at 11, Connick resisted an effort to hold prosecutors accountable for *Brady* compliance because he felt the effort would "make [his] job more difficult." Tr. 978. He never disciplined or fired a single prosecutor for violating *Brady*. Tr. 182–183. The jury was told of this Court's decision in *Kyles* v. *Whitley*, 514 U. S. 419 (1995), a capital case prosecuted by Connick's Office that garnered attention because it featured "so many instances of the state's failure to disclose exculpatory evidence." *Id.*, at 455 (Stevens, J., concurring). When questioned about *Kyles*, Connick told the jury he was satisfied with his Office's practices and saw no need, occasioned by *Kyles*, to make any changes. Tr. 184–185. In both quantity and quality, then, the evidence canvassed here was more than sufficient to warrant a jury determination that Connick and the prosecutors who served under him were not merely negligent regarding *Brady*. Rather, they were deliberately indifferent to what the law requires.

## B

In *Canton*, this Court spoke of circumstances in which the need for training may be "so obvious," and the lack of

———

prosecution fails, even inadvertently, to disclose bargain with a witness).

training "so likely" to result in constitutional violations, that policymakers who do not provide for the requisite training "can reasonably be said to have been deliberately indifferent to the need" for such training. 489 U. S., at 390. This case, I am convinced, belongs in the category *Canton* marked out.

*Canton* offered an often-cited illustration. "[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons." *Ibid.*, n. 10. Those policymakers, *Canton* observed, equip police officers with firearms to facilitate such arrests. *Ibid.* The need to instruct armed officers about "constitutional limitations on the use of deadly force," *Canton* said, is "'so obvious,' that failure to [train the officers] could properly be characterized as 'deliberate indifference' to constitutional rights." *Ibid.*

The District Court, tracking *Canton*'s language, instructed the jury that Thompson could prevail on his "deliberate indifference" claim only if the evidence persuaded the jury on three points. First, Connick "was certain that prosecutors would confront the situation where they would have to decide which evidence was required by the Constitution to be provided to the accused." Tr. 1099. Second, "the situation involved a difficult choice[,] or one that prosecutors had a history of mishandling, such that additional training, supervision or monitoring was clearly needed." *Ibid.* Third, "the wrong choice by a prosecutor in that situation would frequently cause a deprivation of an accused's constitutional rights." *Ibid.*; Record 1619–1620; see *Canton*, 489 U. S., at 390, and n. 10; *Walker* v. *New York*, 974 F. 2d 293, 297–298 (CA2 1992).[17]

---

[17] JUSTICE SCALIA contends that this "theory of deliberate indifference would repeal the law of *Monell*," and creates a danger that "'failure to train' would become a talismanic incantation producing municipal

Petitioners used this formulation of the failure to train standard in pretrial and post-trial submissions, Record 1256–1257, 1662, and in their own proposed jury instruction on deliberate indifference.[18] Nor do petitioners dis-

————————

liability [i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee." *Ante*, at 2–3 (some internal quotation marks omitted). The District Court's charge, however, cautiously cabined the jury's assessment of Connick's deliberate indifference. See, *e.g.*, Tr. 1100 ("Mr. Thompson must prove that more likely than not the *Brady* material would have been produced if the prosecutors involved in his underlying criminal cases had been properly trained, supervised or monitored regarding the production of *Brady* evidence."). See also *id.*, at 1096–1097, 1099–1100.

The deliberate indifference jury instruction in this case was based on the Second Circuit's opinion in *Walker* v. *New York*, 974 F. 2d 293, 297–298 (1992), applying *Canton* to a §1983 complaint alleging that a district attorney failed to train prosecutors about *Brady*. JUSTICE SCALIA's fears should be calmed by post-*Walker* experience in the Second Circuit. There has been no "litigation flood or even rainfall," *Skinner* v. *Switzer*, 562 U. S. ___ (2011) (slip op., at 12), in that Circuit in *Walker*'s wake. See Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 39 ("Tellingly, in the Second Circuit, in the nearly 20 years since the court decided *Walker*, there have been no successful lawsuits for non-*Brady* constitutional violations committed by prosecutors at trial (and no reported 'single violation' *Brady* case)." (citation omitted)); Brief for Center on the Administration of Criminal Law, New York University School of Law, et al. as *Amici Curiae* 35–36 (*Walker* has prompted "no flood of §1983 liability").

[18] The instruction Connick proposed resembled the charge given by the District Court. See *supra*, at 24. Connick's proposed instruction read: "Before a district attorney's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens: (1) the plaintiff must show that Harry Connick knew 'to a moral certainty' that his employees will confront a given situation; (2) the plaintiff must show that the situation either presents the employee with a difficult choice . . . such that training or supervision will make the choice less difficult or that there is a history of employees mishandling the situation; and (3) the plaintiff must show that the wrong choice by the assistant district attorney will frequently cause the deprivation of a citizen's constitutional rights." Record 992 (citing *Canton*, 489 U. S., at 390; punctuation altered). But cf. *ante*, at 3 (SCALIA, J., concurring) (criticizing "Thompson's theory" of deliberate indifference).

pute that Connick "kn[e]w to a moral certainty that" his prosecutors would regularly face *Brady* decisions.  See *Canton*, 489 U. S., at 390, n. 10.

The jury, furthermore, could reasonably find that *Brady* rights may involve choices so difficult that Connick obviously knew or should have known prosecutors needed more than perfunctory training to make the correct choices.  See *Canton*, 489 U. S., at 390, and n. 10.[19]  As demonstrated earlier, see *supra*, at 16–18, even at trial prosecutors failed to give an accurate account of their *Brady* obligations.  And, again as emphasized earlier, see *supra*, at 18–20, the evidence permitted the jury to conclude that Connick should have known *Brady* training in his office bordered on "zero."  See Tr. of Oral Arg. 41.  Moreover, Connick understood that newer prosecutors needed "very clear" guidance and should not be left to grapple with *Brady* on their own.  Tr. 834–835.  It was thus "obvious" to him, the jury could find, that constitutional rights would be in jeopardy if prosecutors received slim to no *Brady* training.

Based on the evidence presented, the jury could conclude that *Brady* errors by untrained prosecutors would frequently cause deprivations of defendants' constitutional rights.  The jury learned of several *Brady* oversights in

---

Petitioners, it is true, argued all along that "[t]o prove deliberate indifference, Thompson had to demonstrate a pattern of violations," Brief for Appellants in No. 07–30443 (CA5), p. 41; see *ante*, at 3–4 (SCALIA, J., concurring), but the court rejected their categorical position.  Petitioners did not otherwise assail the District Court's formulation of the deliberate indifference instruction.  *E.g.*, Record 1662.

[19] Courts have noted the often trying nature of a prosecutor's *Brady* obligation.  See, *e.g.*, *State* v. *Whitlock*, 454 So. 2d 871, 874 (La. App. 1984) (recognizing, in a case involving *Brady* issues in Connick's Office, that "it is usually most difficult to determine whether or not inconsistencies or omitted information in witnesses' statements are material to the defendant's guilt" (quoting *State* v. *Davenport*, 399 So. 2d 201, 204 (La. 1981))).

Thompson's trials and heard testimony that Connick's Office had one of the worst *Brady* records in the country. Tr. 163. Because prosecutors faced considerable pressure to get convictions, *id.*, at 317, 341, and were instructed to "turn over what was required by state and federal law, but no more," Brief for Petitioners 6–7, the risk was all too real that they would err by withholding rather than revealing information favorable to the defense.

In sum, despite JUSTICE SCALIA's protestations to the contrary, *ante*, at 1, 5, the *Brady* violations in Thompson's prosecutions were not singular and they were not aberrational. They were just what one would expect given the attitude toward *Brady* pervasive in the District Attorney's Office. Thompson demonstrated that no fewer than five prosecutors—the four trial prosecutors and Riehlmann— disregarded his *Brady* rights. He established that they kept from him, year upon year, evidence vital to his defense. Their conduct, he showed with equal force, was a foreseeable consequence of lax training in, and absence of monitoring of, a legal requirement fundamental to a fair trial.[20]

_____

[20] The jury could draw a direct, causal connection between Connick's deliberate indifference, prosecutors' misapprehension of *Brady*, and the *Brady* violations in Thompson's case. See, *e.g.*, *supra*, at 17 (prosecutors' misunderstandings of *Brady* "were in large part responsible for the gross disregard of *Brady* rights Thompson experienced"); *supra*, at 18 ("The jury could attribute the violations of Thompson's rights directly to prosecutors' misapprehension of *Brady*."); *supra*, at 17–18 (Williams did not believe *Brady* required disclosure of impeachment evidence and did not believe he had any obligation to turn over the impeaching "close-cut hair" police reports); *supra*, at 18 (At the time of the armed robbery trial, Williams reported that the results of the blood test on the swatch were "inconclusive"); *ibid.* ("[Williams] testified . . . that the lab report was not *Brady* material . . . ."); *supra*, at 19–20 (Dubelier and Williams, the lead prosecutors in Thompson's trials, "learned the prosecutorial craft in Connick's Office," "did not recall any *Brady* training," demonstrated "a woefully deficient understanding of *Brady*," and received no supervision during Thompson's trials); *supra*, at 21 ("Had *Brady*'s

## C

Unquestionably, a municipality that leaves police offi-
cers untrained in constitutional limits on the use of deadly
weapons places lives in jeopardy.  *Canton*, 489 U. S., at
390, n. 10.  But as this case so vividly shows, a municipal-
ity that empowers prosecutors to press for a death sen-
tence without ensuring that those prosecutors know and
honor *Brady* rights may be no less "deliberately indiffer-

_____

importance been brought home to prosecutors, surely at least one of the
four officers who knew of the swatch and lab report would have re-
vealed their existence to defense counsel and the court."); *supra*, at 23
(Connick did not want to hold prosecutors accountable for *Brady*
compliance because he felt that doing so would make his job more
difficult); *supra*, at 23 (Connick never disciplined a single prosecutor for
violating *Brady*); *supra*, at 27 ("Because prosecutors faced considerable
pressure to get convictions, and were instructed to turn over what was
required by state and federal law, but no more, the risk was all too real
that they would err by withholding rather than revealing information
favorable to the defense." (citations and internal quotation marks
omitted)).  But cf. *ante*, at 7, n. 5 ("The dissent believes that evidence
that the prosecutors allegedly 'misapprehen[ded]' *Brady* proves causa-
tion.").

I note, furthermore, that the jury received clear instructions on the
causation element, and neither Connick nor the majority disputes the
accuracy or adequacy of the instruction that, to prevail, Thompson
must prove "that more likely than not the *Brady* material would have
been produced if the prosecutors involved in his underlying criminal
cases had been properly trained, supervised or monitored regarding the
production of *Brady* evidence."  Tr. 1100.

The jury was properly instructed that "[f]or liability to attach because
of a failure to train, the fault must be in the training program itself, not
in any particular prosecutor."  *Id.*, at 1098.  Under that instruction, in
finding Connick liable, the jury necessarily rejected the argument—
echoed by JUSTICE SCALIA—that Deegan "was the only bad guy."  *Id.*, at
1074.  See also *id.*, at 1057; *ante*, at 5.  If indeed Thompson had shown
simply and only that Deegan deliberately withheld evidence, I would
agree that there would be no basis for liability.  But, as reams of
evidence showed, disregard of *Brady* occurred, over and over again in
Orleans Parish, before, during, and after Thompson's 1985 robbery and
murder trials.

ent" to the risk to innocent lives.

*Brady*, this Court has long recognized, is among the most basic safeguards brigading a criminal defendant's fair trial right. See *Cone* v. *Bell*, 556 U. S. ___, ___ (2009) (slip op., at 1). See also *United States* v. *Bagley*, 473 U. S. 667, 695 (1985) (Marshall, J., dissenting). Vigilance in superintending prosecutors' attention to *Brady*'s requirement is all the more important for this reason: A *Brady* violation, by its nature, causes suppression of evidence beyond the defendant's capacity to ferret out. Because the absence of the withheld evidence may result in the conviction of an innocent defendant, it is unconscionable not to impose reasonable controls impelling prosecutors to bring the information to light.

The Court nevertheless holds *Canton*'s example inapposite. It maintains that professional obligations, ethics rules, and training—including on-the-job training—set attorneys apart from other municipal employees, including rookie police officers. *Ante*, at 12–15. Connick "had every incentive at trial to attempt to establish" that he could reasonably rely on the professional education and status of his staff. Cf. *ante*, at 10, n. 6. But the jury heard and rejected his argument to that effect. Tr. 364, 576–577, 834–835.

The Court advances Connick's argument with greater clarity, but with no greater support. On what basis can one be confident that law schools acquaint students with prosecutors' unique obligation under *Brady*? Whittaker told the jury he did not recall covering *Brady* in his criminal procedure class in law school. Tr. 335. Dubelier's *alma mater*, like most other law faculties, does not make criminal procedure a required course.[21]

_____

[21] See Tulane University Law School, Curriculum, http://www.law .tulane.edu (select "Academics"; select "Curriculum") (as visited Mar. 21, 2011, and in Clerk of Court's case file).

Connick suggested that the bar examination ensures that new attorneys will know what *Brady* demands. Tr. 835. Research indicates, however, that from 1980 to the present, *Brady* questions have not accounted for even 10% of the total points in the criminal law and procedure section of any administration of the Louisiana Bar Examination.[22] A person sitting for the Louisiana Bar Examination, moreover, need pass only five of the exam's nine sections.[23] One can qualify for admission to the profession with no showing of even passing knowledge of criminal law and procedure.

The majority's suggestion that lawyers do not need *Brady* training because they "are equipped with the tools to find, interpret, and apply legal principles," *ante*, at 17–18, "blinks reality" and is belied by the facts of this case. See Brief for Former Federal Civil Rights Officials and Prosecutors as *Amici Curiae* 13. Connick himself recognized that his prosecutors, because of their inexperience, were not so equipped. Indeed, "understanding and complying with *Brady* obligations are not easy tasks, and the appropriate way to resolve *Brady* issues is not always self-evident." Brief for Former Federal Civil Rights Officials and Prosecutors as *Amici Curiae* 6. "*Brady* compliance," therefore, "is too much at risk, and too fundamental to the fairness of our criminal justice system, to be taken for granted," and "training remains critical." *Id.*, at 3, 7.

The majority further suggests that a prior pattern of similar violations is necessary to show deliberate indifference to defendants' *Brady* rights. See *ante*, at 5–6, and n. 4, 11–12.[24] The text of §1983 contains no such limita-

---

[22] See Supreme Court of Louisiana, Committee on Bar Admissions, Compilation of Louisiana State Bar Examinations, Feb. 1980 through July 2010 (available in Clerk of Court's case file).

[23] See La. State Bar Assn., Articles of Incorporation, Art. 14, §10(A), La. Rev. Stat. Ann. §37, ch. 4, App. (West 1974); *ibid.* (West 1988).

[24] *Board of Comm'rs of Bryan Cty.* v. *Brown*, 520 U. S. 397 (1997),

tion.[25] Nor is there any reason to imply such a limitation.[26] A district attorney's deliberate indifference might be shown in several ways short of a prior pattern.[27] This

_____

reaffirmed "that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.*, at 409. Conducting this inquiry, the Court has acknowledged, "may not be an easy task for the factfinder." *Canton* v. *Harris*, 489 U. S. 378, 391 (1989). *Bryan County* did not retreat from this Court's conclusion in *Canton* that "judge and jury, doing their respective jobs, will be adequate to the task." 489 U. S., at 391. See also *Bryan County*, 520 U. S., at 410 (absent a pattern, municipal liability may be predicated on "a particular glaring omission in a training regimen"). But cf. *ante*, at 16–18 (suggesting that under no set of facts could a plaintiff establish deliberate indifference for failure to train prosecutors in their *Brady* obligation without showing a prior pattern of violations).

[25] When Congress sought to render a claim for relief contingent on showing a pattern or practice, it did so expressly. See, *e.g.*, 42 U. S. C. §14141(a) ("It shall be unlawful for any governmental authority . . . to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights . . . protected by the Constitution . . . ."); 15 U. S. C. §6104(a) ("Any person adversely affected by any pattern or practice of telemarketing . . . may . . . bring a civil action . . . ."); 49 U. S. C. §306(e) (authorizing the Attorney General to bring a civil action when he "has reason to believe that a person is engaged in a pattern or practice [of] violating this section"). See also 47 U. S. C. §532(e)(2)–(3) (authorizing the Federal Communications Commission to establish additional rules when "the Commission finds that the prior adjudicated violations of this section constitute a pattern or practice of violations").

[26] In the end, the majority leaves open the possibility that something other than "a pattern of violations" could also give a district attorney "specific reason" to know that additional training is necessary. See *ante*, at 14–15. Connick, by his own admission, had such a reason. See *supra*, at 18–20.

[27] For example, a prosecutor's office could be deliberately indifferent if it had a longstanding open-file policy, abandoned that policy, but failed to provide training to show prosecutors how to comply with their *Brady* obligations in the altered circumstances. Or a district attorney could be deliberately indifferent if he had a practice of paring well-trained prosecutors with untrained prosecutors, knew that such supervision

case is one such instance. Connick, who himself had been indicted for suppression of evidence, created a tinderbox in Orleans Parish in which *Brady* violations were nigh inevitable. And when they did occur, Connick insisted there was no need to change anything, and opposed efforts to hold prosecutors accountable on the ground that doing so would make his job more difficult.

A District Attorney aware of his office's high turnover rate, who recruits prosecutors fresh out of law school and promotes them rapidly through the ranks, bears responsibility for ensuring that on-the-job training takes place. In short, the buck stops with him.[28] As the Court recognizes, "the duty to produce *Brady* evidence to the defense" is "[a]mong prosecutors' unique ethical obligations." *Ante*, at 13. The evidence in this case presents overwhelming support for the conclusion that the Orleans Parish Office slighted its responsibility to the profession and to the State's system of justice by providing no on-the-job *Brady* training. Connick was not "entitled to rely on prosecutors' professional training," *ante*, at 14, for Connick himself should have been the principal insurer of that training.

\*     \*     \*

For the reasons stated, I would affirm the judgment of the U. S. Court of Appeals for the Fifth Circuit. Like that court and, before it, the District Court, I would uphold the

———————

had stopped untrained prosecutors from committing *Brady* violations, but nevertheless changed the staffing on cases so that untrained prosecutors worked without supervision.

[28] If the majority reads this statement as an endorsement of *respondeat superior* liability, *ante*, at 18, n. 12, then it entirely "misses [my] point," cf. *ante*, at 17. *Canton* recognized that deliberate indifference liability and *respondeat superior* liability are not one and the same. 489 U. S., at 385, 388–389. Connick was directly responsible for the *Brady* violations in Thompson's prosecutions not because he hired prosecutors who violated *Brady*, but because of his own deliberate indifference.

jury's verdict awarding damages to Thompson for the gross, deliberately indifferent, and long-continuing violation of his fair trial right.